**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SHOSHANTI BARJO )<br>c/o 1099 New York Avenue, NW, Suite 900 )<br>Washington, D.C. 20001 )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VIVIAN R. CHERIAN )<br>6300 Lone Oak Drive )<br>Bethesda, MD 20817 )<br>Montgomery County )<br>)<br>KENNETH M. CHERIAN )<br>6300 Lone Oak Drive )<br>Bethesda, MD 20817 )<br>Montgomery County )<br>)<br>ABERDEEN HOUSE, INC. )<br>13821 Bauer Drive )<br>Rockville, MD 20853 )<br>Montgomery County )<br>)<br>Defendants. ) | Civil Action No. _____<br><br>**COMPLAINT** |

Plaintiff Shoshanti Barjo (hereinafter "Shanti" or "Plaintiff") files this Complaint against Defendants Vivian R. Cherian, Kenneth M. Cherian, and Aberdeen House, Inc., and alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff was a victim of transnational human trafficking at the hands of World Bank employee Vivian Cherian and her husband, business owner Kenneth Cherian (collectively the "Cherians" or "Cherian Defendants"). For fifteen years, the Cherians forced Plaintiff to perform demanding labor without adequate pay, isolated her from the outside world, and tormented her psychologically.

2. Plaintiff met the Cherians in India, where she was born and raised in rural poverty. When Vivian Cherian (hereinafter "Vivian") was offered a job at the World Bank, the Cherians lured Plaintiff to join them as a domestic worker with false promises of reasonable work and pay. Upon arriving in the United States, however, the Cherians confiscated Plaintiff's passport and forced her to work more than 100 hours per week without adequate pay. The Cherians provided substandard living conditions, at times forcing Plaintiff to live in their basement without a bed or blanket.

3. The Cherians forbade Plaintiff from having friends, refused to allow her to study English, and rendered her entirely dependent on them. They also forced her to perform backbreaking work for the Aberdeen House, Inc. (hereinafter "Aberdeen House"), an assisted living facility owned and operated by Kenneth Cherian (hereinafter "Kenneth"). Vivian repeatedly refused Plaintiff's requests to return her passport, threatened her when she asked for pay or for her passport, and expressed that she might be deported if she sought help.

4. The Cherians' actions have caused lasting physical and psychological damage to Plaintiff. Accordingly, Plaintiff seeks damages, including many years of unpaid wages, as compensation for harm suffered as a trafficking victim.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1595.

6. Venue is proper in this District under 28 U.S.C. § 1391(c)(1) because Defendants are domiciled in Maryland.

## PARTIES

7. Plaintiff Shanti Barjo is a 41-year-old citizen of India, currently residing in the United States. The Cherians trafficked Shanti to the United States in 1997 using a G-5 non-

immigrant visa, a visa category reserved for domestic workers of international organization employees.

8. Defendant Vivian Cherian is a resident of Bethesda, Maryland, and, on information and belief, is an employee of the World Bank in Washington, District of Columbia.

9. Defendant Kenneth Cherian is Vivian's husband. Kenneth owns and operates an assisted living facility, Aberdeen House, in Rockville, Maryland.

10. Upon information and belief, Defendant Aberdeen House, Inc. is a Maryland company. Aberdeen House's principal place of business is 13821 Bauer Drive, Rockville, Maryland 20853. Its corporate resident agent in the State of Maryland is Kenneth Cherian. Aberdeen House provides assisted living services for the elderly.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Employment With The Cherians In India

11. Plaintiff Shanti Barjo was born in 1976. She was raised in a small farming village in India. Her family—which included her father, four brothers, and one sister—lived in extreme poverty. As subsistence farmers, her father and older siblings were rarely able to bring in any money.

12. Shanti's mother passed away when Shanti was a young girl.

13. Shanti was home-schooled for one year before she began working the fields with her family, caring for her younger siblings, and taking care of their living space. At the age of eleven, she began working full-time.

14. Shanti worked as a housekeeper for an employer in the city of Pune, India, until 1994, at which point her services were no longer needed. Her employer introduced the then-eighteen-year-old Shanti to Vivian Cherian. Because Shanti's family had no income and lived in poverty, she agreed to take the job with the Cherians to support her family.

15.     In 1994, Shanti began working for the Cherians on a part-time basis in Pune, India, caring for their four children and cleaning their home.

16.     In 1995, Shanti moved into the Cherians' home and began working for the Cherian Defendants full time. Shanti performed household tasks and cared for the Cherians' children but she shared the work with other domestic workers. While in India, the Cherians were reasonable employers, and Shanti knew that she could leave if she wanted to do so.

## II.     Vivian Lures Shanti To The United States For Forced Labor.

17.     In 1997, Vivian was offered a job at the World Bank in Washington, DC. Vivian proposed to Shanti that she move to the United States and continue working for the Cherians.

18.     The Cherians told Shanti about the resources available in the United States. From the Cherians' description, Shanti believed that her work for the Cherians would be easier and less time-consuming because she would have household appliances—like a dishwasher, laundry machine, and vacuum—to help her.

19.     Shanti desperately needed money to support her family, and therefore agreed to continue working for the Cherians in the United States. She did not know at the time that she would be forced to perform fifteen years of difficult work for the Cherians in worse conditions than India, that she would endure the Cherians' abuse, and that she would be held captive.

20.     On May 15, 1997, Vivian and Shanti signed an employment contract (hereinafter, the "Contract"). A true and correct copy of the employment contract is attached hereto as Exhibit A. The Contract stated that Shanti's "wages shall be at a rate of two hundred and ten dollars ($210.00) per week," and that Shanti would work, on average, forty hours per week, and under no circumstances over sixty hours per week. Exhibit A at ¶¶ 3.1, 4.1. The Contract also stipulated that all hours worked in excess of forty hours would be compensated at a higher rate. Exhibit A at ¶ 4.3.

21. The Contract was written in English. Shanti could not read the Contract herself, but she trusted Vivian's representations as to its content. Vivian assured Shanti that the contract stated she would be regularly paid. Shanti signed the Contract with a fingerprint.

22. After signing the Contract, Vivian arranged for the issuance of Shanti's Indian passport. Vivian accompanied Shanti to pick up the passport in Mumbai and immediately took possession of the passport.

23. Vivian submitted an application on Shanti's behalf to the U.S. government for a G-5 visa. In accordance with the U.S. Department of State's procedures, the Cherians were required to submit the Contract to the Department of State for review. Shanti received a G-5 visa from the U.S. government on May 22, 1997.

24. In or about 1997, Shanti flew from Mumbai, India to Dulles International Airport with Vivian and Vivian's four children. The Cherians purchased Shanti's plane ticket to the United States.

25. After the Cherian family and Shanti entered the United States, Vivian continued to hold and control Shanti's passport. Shanti believed this to be custom and that Vivian kept her passport for safekeeping.

26. Upon information and belief, Vivian never intended to honor the terms of the Contract. She provided the contract to Shanti in order to fraudulently obtain a G-5 visa for Shanti to come to the United States as a domestic worker. She purposefully deceived Shanti into accepting her offer to work in the United States by guaranteeing a salary that she never intended to pay.

**III. The Cherians Subject Shanti To Forced Labor In Their Home In The United States.**

27. After arriving in the United States, Vivian, her four children (ages thirteen, eight, seven, and five), and Shanti moved in with Vivian's husband, Kenneth. The family lived in a

three-bedroom, two-bathroom apartment in Silver Spring, Maryland. In December of 1997, Shanti moved with the Cherians to a four-bedroom, three-bathroom house in Bethesda, Maryland.

28. To Shanti's dismay, the Cherians did not treat her as they had treated her in India. Instead, the Cherians exploited and abused Shanti, rendered her dependent on them, and took advantage of her vulnerability over numerous years to extract thousands of hours of unpaid labor.

### A. The Cherians Abuse Shanti And Deliberately Do Not Honor The Terms Of Their Contract.

29. Immediately after her arrival, Shanti began working as a domestic servant and nanny in the Cherian home. Shanti was responsible for all of the household labor. Her duties included cleaning the house, cooking for the family, doing the laundry, walking the children to school, and bathing the children. The Cherians did not limit Shanti's work to forty hours per week, as agreed upon in the Contract. Instead, they required Shanti to work between 100 and 110 hours per week. Shanti was made to wake up at 6:30 a.m. and work until 9 p.m. or 10 p.m.

30. Shanti—who was twenty-one years old when she came to the United States, just six years older than the Cherians' oldest child—trusted the Cherians and believed the Cherians were looking out for her.

31. The Cherians manipulated Shanti's naiveté to keep her obedient and submissive. The Cherians constantly reminded her that she had to be "good," and made statements such as "Vivian brought you here, you have to be good, you have to do what Vivian says." The Cherians taught Shanti that to be "good," she had to work tirelessly without complaint, and to at all times be grateful for her visa and her presence in the United States. Advocating for her own interests—for her salary, for her passport, or for better conditions—or considering departure was "bad."

32. Because of this psychological manipulation, Shanti felt she had no choice and could not complain, even though she found her work in the United States difficult and the hours long.

6

33. Soon after coming to the United States, Vivian's demeanor toward Shanti changed. Vivian began to psychologically abuse and torment Shanti. Vivian screamed at Shanti on a daily basis and treated her like a slave. For example, on one occasion, after Shanti woke up at 7 a.m. instead of 6:30 a.m., Vivian entered Shanti's sleeping area and screamed "Get up! Get out of my house," thereby reducing Shanti to tears. Incidents such as this one were common throughout Shanti's time with the Cherians. Vivian also constantly belittled Shanti for her lower-class, agricultural roots and impoverished family, thereby reminding Shanti that she had work and a U.S. visa only because of the Cherians.

34. The Cherians failed to provide Shanti with adequate living conditions. Shanti was assigned to live for a time in the basement of the family home, and was not provided with a bed or even a blanket. Instead, she was forced to sleep on a sheet on the floor and, later, on a sofa. During her years in the Cherians' home, Shanti was never able to sleep on a bed. At one point, Vivian closed the heating vent in the basement where Shanti slept in order to deny heat to Shanti.

35. Vivian reacted angrily when Shanti requested improvements to her living conditions. When Shanti asked Vivian for a blanket, Vivian became angry and said, "You used to sleep on the floor in India, why do you need anything more?" She also stated that Shanti should not be cold because the floor had a carpet. Similarly, when Shanti asked Vivian for a jacket because she often got sick walking the children to school in the cold, Vivian became angry and chastised Shanti for making the request.

36. Vivian strictly controlled Shanti's daily routine, including by monitoring the food that she ate. The Cherians did not allow Shanti to eat with the family, nor did they offer her food. Instead, she was expected to eat whatever was left over after the family's meals. Shanti was tasked with feeding breakfast to the children, and Vivian would interrogate her regarding exactly which

7

items of food the children ate, so as to prevent Shanti from taking food for herself. On one occasion, Shanti drank some juice that was on the kitchen counter, mistakenly believing that it was for everyone. Vivian became enraged and yelled, "It's not for you, you can't drink it." On another occasion, Vivian berated Shanti for eating potato chips that had been set out on their counter for a party.

37. As a result of the Cherians' treatment, Shanti began to feel trapped and subhuman. She wanted to work reasonable hours and to live in decent conditions, but she was terrified of provoking Vivian by asking for changes to her living and working situation.

### B. The Cherians Fail To Pay Shanti.

38. The Cherians did not pay Shanti for her work as required by the terms of the Contract. Vivian led Shanti to believe that money was being deposited in a bank account in Shanti's name. Shortly after they arrived in the United States, Vivian showed Shanti a deposit slip that she claimed showed transfers into Shanti's bank account. However, upon information and belief, Vivian never opened such a bank account, and in fact had no intention of ever maintaining one for Shanti. Vivian never again showed Shanti a deposit slip reflecting deposits into Shanti's supposed bank account.

39. When Shanti asked for the money, Vivian became angry and said, "I'm not going to help you get rich." Vivian also told Shanti that Shanti had to work in order to make up for the trouble Vivian went through of procuring a passport for Shanti.

40. Shanti first asked to be paid before Vivian went on vacation to India. Because Vivian would be absent for the winter, Shanti asked for money to buy winter clothes in preparation for the cold weather. Vivian became furious, reacting as if Shanti had asked for something absurd. Vivian refused to give Shanti any money for winter clothes.

41. Fearing Vivian's reactions, Shanti became too terrified to continue asking for her pay.

42. Occasionally, Vivian sent payments of a few hundred dollars to Shanti's family. However, these payments did not come close to equaling the wages Shanti was entitled to under applicable minimum wage and overtime laws and the terms of the contract. Vivian also never allowed Shanti to take sick leave, vacation time, or any other time off.

### C. The Cherians Isolate Shanti From The Outside World, Prevent Her From Seeking Help, And Cause Her Immigration Status To Lapse.

43. The Cherians deliberately isolated Shanti and rendered her completely dependent on them for survival. Shanti was prohibited from interacting with individuals outside of the Cherian family without supervision. She was not permitted to go to restaurants or malls by herself. Vivian also prohibited Shanti from studying English.

44. The Cherian Defendants allowed Shanti to speak with her family in India only on rare occasions. When she was permitted to call her family, Shanti was not allowed to speak with her family privately. Vivian called Shanti's family for her and listened in on the conversations.

45. Because Shanti interacted exclusively with individuals who were related or indebted to the Cherians, Shanti felt unable to trust anyone or ask for help. For example, Shanti once asked a contact she knew through the Cherians to help her with her immigration documents at the Indian Embassy. Instead, the contact reported her request to Vivian, who became enraged.

46. The Cherians used Shanti's passport and immigration status as leverage to hold Shanti and prevent her from seeking help. The Cherians held Shanti's passport in a locked briefcase where she could not access it. Around 2003, Shanti first asked for her passport back. Vivian refused to return the passport, asking Shanti, "what passport?"

9

47. Eventually, the Cherians failed to renew Shanti's G-5 visa and allowed Shanti's visa to lapse. On information and belief, the Cherians purposefully caused Shanti's visa to lapse. After the visa lapsed, Vivian threatened Shanti with deportation when Shanti asked for her passport. Vivian also constantly reminded Shanti of deportation as a means of controlling Shanti. For example, Vivian warned Shanti from taking action by saying statements such as, "don't do that, because you don't have a passport," or "don't do that, you may be sent home." As a result, Shanti felt like her passport was her only way to freedom; without it, she felt trapped.

48. Because of the Cherians' threats, Shanti feared deportation and, as a result, felt even more afraid of asking the Cherians for her passport or salary. Lacking money and immigration status, and cut off from family and friends, Shanti believed that it was impossible to escape the Cherians.

**IV.  The Cherians Force Shanti To Work Without Sufficient Pay In Their Business.**

49. In mid-2002, Kenneth Cherian opened an assisted living home for the elderly in Rockville, Maryland, called Aberdeen House. At that point, the Cherians' children were older and had either left home or needed less care.

50. Shortly after the opening, Kenneth and Vivian forced Shanti to leave the Cherian home and live and work in Aberdeen House. The Cherians made clear to Shanti that she had no choice but to comply. Vivian told her, "You don't have a visa, but you won't need it to work in the group home."

51. While in the group home, Shanti worked thirteen hours a day, seven days a week. At night, she was always on call to care for the group home's residents. Shanti shoveled snow, mowed the lawn, raked leaves, cleaned the facility, washed dishes, did laundry, supervised residents, and bathed residents. The work was difficult and physically demanding. For example, Shanti was made to pick up and move residents.

10

52. Shanti was supervised at Aberdeen House by Kenneth and Kenneth's mother, Premila Cherian.

53. Premila frequently subjected Shanti to humiliation and abuse. For example, she insulted Shanti, telling her, "You look and walk like a man" and "you're a street servant." Further, while Shanti was made to cook food for every employee at Aberdeen House, Premila frequently became angry when Shanti ate and, on occasion, forced Shanti to eat her food after other employees.

54. On one occasion, when government inspectors came to Aberdeen House, Shanti hid in the basement until the inspection was over. During this incident, Shanti felt useless and ashamed, and she was afraid that she would be found and deported.

55. Upon information and belief, Kenneth regularly paid other employees at Aberdeen House, but not Shanti, even though Shanti asked to be paid for all of the hours she worked. For her years of work at Aberdeen House, Shanti was severely underpaid and received only a pittance.

56. In 2003, Shanti told Vivian that she wanted to stop working at Aberdeen House. Shanti also requested that Vivian return her passport. Vivian ignored Shanti's requests.

57. In 2004, Shanti fell ill. As a result of two years of intense physical labor at Aberdeen House, Shanti developed severe leg pain.

58. The Cherians did not give Shanti any time off from her work at Aberdeen House. The Cherians took Shanti to see Vivian's brother-in-law, a family doctor. The Cherians then moved Shanti back to their home in Bethesda, where they forced her to continue performing full-time domestic work from 2004 to 2006.

59. Due to overexertion and lack of adequate medical care while in the custody of the Cherians, Shanti continues to suffer from pain in her legs and knees.

60. In 2007, when they determined she was well enough, the Cherians forced Shanti to return to work in Aberdeen House.

61. In 2007, another worker at the group home was studying English. Shanti became interested in studying English and asked Vivian to take her to an English language class. Vivian was angered by the request, and told Shanti, "you don't even have your passport, what do you think you're going to be able to do?" Vivian then called the other worker and demanded that the worker not help Shanti.

62. Following that incident, Shanti repeatedly requested that Vivian return her passport. Shanti was frequently crying out of desperation while she made these requests. Each time, Vivian refused to provide Shanti with her passport. Vivian told Shanti "No one will help you but me."

## V.     Shanti Flees The Cherians After Fifteen Years.

63. Shanti finally managed to procure her passport and soon after—on February 12, 2012—fled the Cherians.

64. Since her escape, Shanti continues to suffer the mental and physical effects of her time with the Cherians. Physically, her right leg continues to give her severe pain from her years of working at Aberdeen House.

65. Mentally, Shanti's experience with the Cherians continues to haunt her. The psychological abuse she suffered at the hands of the Cherians has left her untrusting of others and pessimistic about the world. Shanti lives in fear of deportation. Because of the Cherians' exploitation and abuse, Shanti has been unable to visit her family or amass the funds needed to pay for a plane ticket. She has not seen her family since she was trafficked to the United States.

## COUNT ONE

### Forced Labor Violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1589, 1595
(*alleged against Vivian Cherian and Kenneth Cherian*)

66. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

67. The Cherian Defendants knowingly obtained Plaintiff's labor and services through a scheme and pattern of abusive behavior intended to cause Plaintiff to believe that if she did not perform those services, she or another person would suffer serious harm, as described by the forced labor provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1589.

68. The Cherian Defendants knowingly obtained Plaintiff's labor and services through threatened abuse of legal process as described by the forced labor provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1589.

69. The Cherian Defendants knowingly benefitted financially by receiving increased profits from Aberdeen House via Plaintiff's unpaid labor by participating in a venture that provided or obtained Plaintiff's labor or services by threatening the abuse of law or legal process, and engaging in a scheme, plan, or pattern intended to cause Plaintiff to believe that, if Plaintiff did not perform such labor or services, Plaintiff or another person would suffer serious harm or physical restraint.

70. The Cherian Defendants obtained this benefit knowingly or in reckless disregard of the fact that the venture, Aberdeen House, was engaged in providing or obtaining labor or services in violation of 18 U.S.C. § 1589(a), and thereby violated 15 U.S.C. § 1589(b).

71. Plaintiff brings these claims under the civil cause of action for victims of forced labor in 18 U.S.C. § 1595.

72. As a direct and proximate result of Defendants' actions, Plaintiff has sustained damages, including physical and mental injury, economic loss, and emotional distress.

73. Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

74. The Cherian Defendants' conduct was extreme and outrageous.

75. Because of the willful, wanton, and malicious nature of the Cherian Defendants' actions, the law entitles Plaintiff to punitive damages.

## COUNT TWO

### Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1590, 1595 (*alleged against Vivian Cherian and Kenneth Cherian*)

76. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

77. By transporting Plaintiff to the United States and, upon arrival, harboring her in the Cherian home and business for the purpose of subjecting Plaintiff to forced labor in violation of 18 U.S.C. § 1589, the Cherian Defendants engaged in trafficking of Plaintiff in violation of 18 U.S.C. § 1590.

78. Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

79. As a direct and proximate result of the Cherian Defendants' actions, Plaintiff has sustained damages, including physical and mental injury, emotional distress, and economic losses.

80. Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

81. Defendants' conduct was extreme and outrageous.

82. Because of the willful, wanton, and malicious nature of the Cherian Defendants' actions, the law entitles Plaintiff to punitive damages.

## COUNT THREE

**Forced Labor Violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1589, 1595**
(*alleged against Aberdeen House*)

83. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

84. Aberdeen House, by and through its agents including Kenneth Cherian, knowingly obtained Plaintiff's labor and/or benefited by participating in a venture that obtained Plaintiff's labor through threatened abuse of law or legal process and a scheme and pattern of abusive behavior intended to cause Plaintiff to believe that if she did not perform those services, she or another person would suffer serious harm, as described by the forced labor provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1589.

85. Aberdeen House obtained a valuable benefit through its participation in the venture in the form of uncompensated labor from Plaintiff.

86. Aberdeen House received a benefit from the venture knowingly or in reckless disregard of the fact that the venture engaged in the providing or obtaining of labor or services in violation of 18 U.S.C. § 1589(a), and thereby violated 15 U.S.C. § 1589(b).

87. Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

88. As a direct and proximate result of Aberdeen House's actions, Plaintiff has sustained damages, including physical and mental injury, emotional distress, and economic losses.

89. Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

90. Aberdeen House's conduct was extreme and outrageous.

91. Because of the willful, wanton, and malicious nature of Aberdeen House's actions, the law entitles Plaintiff to punitive damages.

## COUNT FOUR

**Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1590, 1595**
(*alleged against Aberdeen House*)

92. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

93. By obtaining Plaintiff and harboring Plaintiff on its premises for the purpose of subjecting Plaintiff to forced labor in violation of 18 U.S.C. § 1589, Aberdeen House, by and through its agents including Kenneth Cherian, engaged in trafficking of Plaintiff in violation of 18 U.S.C. § 1590.

94. Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

95. As a direct and proximate result of Aberdeen House's actions, Plaintiff has sustained damages, including physical and mental injury, emotional distress, and economic losses.

96. Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

97. Aberdeen House's conduct was extreme and outrageous.

98. Because of the willful, wanton, and malicious nature of Aberdeen House's actions, the law entitles Plaintiff to punitive damages.

## COUNT FIVE

**Unlawful Conduct With Respect to Documents in Violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1592, 1595**
(*alleged against Vivian Cherian and Kenneth Cherian*)

99. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

16

100. In the course of violating the trafficking and forced labor provisions of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1589 and 1590, the Cherian Defendants knowingly confiscated and possessed Plaintiff's passport and G-5 visa.

101. With the intent of violating the trafficking and forced labor provisions of the Trafficking Victims Protection Act of 2000, 18 U.S.C. §§ 1584, 1589 and 1590, the Cherian Defendants knowingly confiscated and possessed Plaintiff's passport and G-5 visa.

102. Plaintiff was a victim of a severe form of trafficking in persons as defined in Section 103 of the Trafficking Victims Protection Act of 2000, codified at 22 U.S.C. § 7102(9), as she was recruited and harbored for labor and services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude and slavery.

103. By confiscating, possessing, and refusing to return Plaintiff's passport or immigration documents to her, the Cherian Defendants knowingly restricted Plaintiff's liberty to move or travel in order to maintain Plaintiff's labor and services, in violation of 18 U.S.C. § 1592.

104. Plaintiff brings these claims under the civil cause of action for trafficking victims in 18 U.S.C. § 1595.

105. As a direct and proximate result of the Cherian Defendants' actions, Plaintiff has sustained damages, including physical and mental injury, economic loss, and emotional distress.

106. Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

107. The Cherian Defendants' conduct was extreme and outrageous.

108. Because of the willful, wanton, and malicious nature of the Cherian Defendants' actions, the law entitles Plaintiff to punitive damages.

## COUNT SIX

### Conspiracy to Violate the Trafficking Victims Protection Act, 18 U.S.C. §§ 1594, 1595
(*alleged against Vivian Cherian, Kenneth Cherian, and Aberdeen House*)

109. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110. Vivian Cherian, Kenneth Cherian, and Aberdeen House, by and through its agents including Kenneth Cherian, conspired with each other and with Premila Cherian to violate the forced labor prohibition in the Trafficking Victims Protection Act, the trafficking prohibition in the Trafficking Victims Protection Act, and the prohibition against unlawful conduct with respect to documents in furtherance of these crimes in the Trafficking Victims Protection Act. In doing so, the Defendants violated 18 U.S.C. § 1594(b).

111. Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

112. As a direct and proximate result of Defendants' actions, Plaintiff has sustained damages, including physical and mental injury, emotional distress, and economic losses.

113. Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

114. Defendants' conduct was extreme and outrageous.

115. Because of the willful, wanton, and malicious nature of Defendants' actions, the law entitles Plaintiff to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be granted as follows:

A. Money damages for each Count;

B. Punitive and exemplary damages according to proof;

C. Attorneys' fees and costs for Plaintiff against the Defendants; and

D. Such other relief as the Court may deem just and proper.

Dated: June 1, 2018         Respectfully submitted,

                By: /s/ Michael K. Lowman

                Michael K. Lowman (No. 460190)
                Kali N. Bracey*
                Samuel C. Birnbaum*
                Natacha Y. Lam*
                JENNER & BLOCK LLP
                1099 New York Avenue, NW
                Suite 900
                Washington, DC 20001
                Telephone: (202) 639-6000
                Facsimile: (202) 639-6066
                mlowman@jenner.com

                *Attorneys for Plaintiff Shoshanti Barjo*

                **Pro Hac Vice motions forthcoming*