**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____
                                      :
SHOSHANTI BARJO,                      :
                                      :
            Plaintifff,               :
                                      :
    v.                                :           Cause No. 8:18-cv-01587-RWT
                                      :
VIVIAN R. CHERIAN, et al.,            :
                                      :
            Defendants.               :
_____

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants, by and through counsel and pursuant to Fed. R. Civ. P. 12(b)(6) and Local Rule 105, submit this memorandum of law in support of their motion to dismiss Plaintiff's Complaint. Twenty-four (24) years after she first began working for Defendants Vivian and Kenneth Cherian and six (6) years after leaving the employ of Kenneth's business, Aberdeen House, for another job, Plaintiff, Shoshanti Barjo ("Ms. Barjo"), has brought this action alleging that she was a victim of "trafficking" and "forced labor." Stripped of its hyperbole, this case amounts to nothing more than an attempt to rewrite history to gain a financial windfall at the expense of Defendants, who went out of their way to help Ms. Barjo.

The bulk of Plaintiff's Complaint and the majority of her causes of action address matters that occurred between 1997 and 2003. Those claims, however, predicated as they are on 18 U.S.C. §1595, are not actionable, because section 1595 did not become effective until December 19, 2003, and it does not apply retroactively to conduct that occurred before that date. Therefore, Plaintiff's claims arising from events occurring before December 19, 2003 should be dismissed.

Plaintiff's claims arising after December 19, 2003 should also be dismissed, because as her Complaint shows, Ms. Barjo was by that time working at Aberdeen House, and when she left

Aberdeen House in February 2012 she signed a Release in which she plainly and unambiguously waived any and all claims against Aberdeen House and it management, whether legal or financial. Analyzed under basic contract law, that Release constitutes a binding agreement barring Plaintiff's claims as related to Aberdeen House. Accordingly, Defendants' motion to dismiss should be granted, and the Complaint dismissed as a matter of law.

## STATEMENT OF THE FACTS

### A.      Ms. Barjo was not Mistreated in India.

According to the Complaint, Ms. Barjo, a 41 year old citizen of India, began working part time for Mrs. Cherian in 1994 while still in India. Ms. Barjo, who was "born and raised in rural poverty," cared for the Cherians' four children and kept house for them. Compl. ¶¶2, 7, 15. Mrs. Cherian had agreed to take Ms. Barjo in because Ms. Barjo's previous employer no longer wanted her and her family "had no income and lived in poverty." *Id.* at ¶14; Declaration of Vivian R. Cherian, Exhibit 1 to Motion to Dismiss, at ¶2 (noting that Shanti's previous employer "had been very unhappy with Shanti"). The very next day, Ms. Barjo moved into the Cherians' home. Ex. 1 at ¶2. When Mrs. Cherian returned to her job with the World Bank here in the U.S. in 1997, Ms. Barjo agreed to move with them because she had found that "the Cherians were reasonable employers" and she knew "she could leave if she wanted to do so." *Id.* at ¶¶16-19.

Ms. Barjo spoke a different dialect than did the Cherians and so could not understand one another unless they spoke English. Ex. 1 at ¶7. Mrs. Cherian was reluctant to bring Ms. Barjo back to the States because she had concerns about her attitude, her work, and her ability to do what the Cherians needed her to do, such as get up early to help with the children in the mornings. *Id.* at ¶¶3-6. Before leaving India, Ms. Barjo signed an employment contract setting forth the terms and conditions of her employment. *See* Ex. A to Complaint, copy of contract.

2

Mrs. Cherian explained the terms of the agreement to Ms. Barjo in English, and then also had a college student who had done some work for the Cherians translate it into Hindi as well. Ex. 1 at ¶7. Mrs. Cherian also arranged for Ms. Barjo's passport and paid for her airfare to America. Compl. ¶¶22-24.

### B.     Ms. Barjo was not Mistreated in the Cherians' Home.

#### 1.     *Ms. Barjo was well provided for.*

Ms. Barjo claims that the Cherians somehow immediately changed from being "reasonable employers" to being abusive and tyrannical upon arrival in America. *Id.* at ¶¶25-26, 28-29. She also claims that the Cherians engaged in "psychological manipulation," made her feel "trapped and subhuman," and prohibited her from interacting with others or going out alone. *Id.* at ¶¶ 32, 33, 37, 43. But the home in which they soon located in Bethesda, Maryland consisted of four bedrooms and three bathrooms. *Id.* at ¶27. While the Cherian children shared two bedrooms upstairs and bathrooms upstairs, Ms. Barjo had her own bedroom, separate bathroom, and television downstairs in the basement. Ex. 1 at ¶10. Indeed, Ms. Barjo even had a separate entrance, from which she could leave any time she wished. *Id.* Moreover, the only example Ms. Barjo cites (¶33) reflects some of the very conduct that gave Mrs. Cherian pause about bringing Ms. Barjo to the States in the first place -- she regularly overslept, leaving Mrs. Cherian to make breakfast, get the kids up and dressed, and then get them to school, all before Mrs. Cherian could leave for work herself. Ex. 1 at ¶¶4, 6, 11; *see also* Ex. A to Complaint at ¶¶1.1, 1.2 (describing duties of Ms. Barjo: "She will care for my four children aged 15, 10, 8 and 6.").

In fact, the Complaint itself shows that Ms. Barjo was failing to perform her contractual obligations. In paragraph 29, Plaintiff admits that she was required to wake up at 6:30 a.m.

Compl., ¶29. But paragraph 30 admits that Ms. Barjo had overslept, not waking until 7:00 a.m. Compl., ¶33.[1] The ramifications of that particular failure were dire indeed -- it almost cost Mrs. Cherian her job. She was late for work (again), she was severely reprimanded and told she should just leave. Ex. 1 at ¶24.[2]

Furthermore, immediately behind the Bethesda home was their daughter's elementary school, where Ms. Barjo and the Cherians' daughter would often play on the playground together after school, swinging on the swing set, playing badminton, and so forth, and where Ms. Barjo would frequently chat with the parents of other school children. Decl. Kenneth M. Cherian, Ex. 2 attached, at ¶5. In addition, there was often a police officer parked at the school, to whom Ms. Barjo had ready access had she so desired. *Id.* at ¶6. She never even attempted to report any alleged wrongdoing, however.

While Ms. Barjo claims she was made to sleep on the floor and denied a bed (Compl., ¶34), in fact the opposite is true: she was the first one in the house to have a bed. Ex. 1, ¶17. The whole house was carpeted, so Kenneth, Vivian, and their daughter slept on the floor in one bedroom. The two younger boys slept on a mattress on the floor in another room, while the oldest boy slept on a bed with a broken leg, so it was lopsided. It wasn't until much later that they were able to buy a bunk bed at a yard sale and have the younger boys sleep there. *Id.*

---

[1] While Plaintiff insinuates that being 30 minutes late should have been no big deal, in truth Ms. Barjo rarely woke up at all, sometimes sleeping until 1:00 p.m. Ex. 1, ¶13. Mrs. Cherian desperately needed help in those crucial early morning hours, when the children needed to be awakened, fed, clothed, and taken to school, and while Mrs. Cherian also had to commute to work in Washington, D.C. That is why Mrs. Cherian specifically discussed with Ms. Barjo back in India the need for Ms. Barjo to get up early and help with the children as a condition of her being brought to the U.S. Ex. 1, ¶¶6, 11, 24. It was also the leading cause for Mrs. Cherian effectively terminating the contract after only about a year and a half after Ms. Barjo had come to America -- she refused to get up in the mornings. Ex. 1, ¶¶20, 24.

[2] It should be noted that while Mrs. Cherian acknowledges raising her voice to Ms. Barjo on this occasion, she adamantly denies having ever told her to "get out of my house." Ex. 1 at ¶24. Mrs. Cherian also states, under oath, that to the best of her recollection she only raised her voice with Ms. Barjo "one time." It was Ms. Barjo's chronic failure to get up in the morning to help with the children that led Mrs. Cherian to tell Ms. Barjo that it was simply not working out and she would have to return to India. *Id.*

Ms. Barjo also had her choice of bedrooms. Although her Complaint alleges that she was forced to live in the basement (Compl., ¶34), in reality she chose that room. She initially wanted a large bedroom upstairs, but because her sleep was interrupted by the hustle and bustle of kids getting up in the morning -- when she *should have* been getting up -- she asked if she could sleep downstairs, where there was another bed. Ex. 1, ¶16. So she had her own bedroom in the basement, her own bathroom, a TV, and a separate entrance that allowed her to come and go at will. *Id.* Indeed, her bathroom was the nicest in the house, having been recently remodeled by the previous owners. She had that bathroom all to herself, while the remaining six members of the household all shared a "buddy bathroom" (two toilets with a tub between them). *Id.* The key to the basement exit door was hung in the kitchen, which was also on the basement level, and it was accessible to Ms. Barjo and everyone else at all times. *Id.*

Again, Plaintiff claims that she was denied necessities such as a blanket or a jacket. Compl., ¶35. Once more, this allegation fails to pass the plausibility test. Just as Ms. Barjo had her way with regard to which bedroom she occupied, so she got her way with regard to clothing and other personal items. If Ms. Barjo was in need of anything, she was quick to complain. She was not shy, and she let her feelings be known. Ex. 2, ¶23. She always insisted on having the nicest pillows, the choicest fruits, and even the shiniest pencils when she played games with the children. Her toiletries, moisturizers, and perfumes were the nicest in the house; after buying for her, the rest of us had to settle for the dollar products because we could not afford more. *Id.* When Shanti demanded a third long winter coat to go with the two she already had (which were slightly different lengths), Mrs. Cherian did not want to buy it and did not think she needed it, but she gave in and bought it anyway. Mrs. Cherian, on the other hand, had to wear an oversized

men's military coat her sister had found for her at a thrift store because she could not afford a new one. *Id.*

As for blankets, that was one item which the Cherians had in abundance. Mrs. Cherian's mother and siblings were always giving them blankets and sheets. Ex. 2, ¶28. In fact, they had so many of them that they ended up donating many of them to charity. *Id.* As for Ms. Barjo, one year for her birthday they gave her a new set of sheets and a comforter. They also gave her a nice fleece blanket one year for Christmas. *Id.*

> 2.    *Ms. Barjo was free to come and go.*

Plaintiff also claims in her Complaint that the Cherians "isolated" her and made her "completely dependent on them for survival." Compl., ¶43. This claim is palpably untrue. In fact, Ms. Barjo could hardly have had more freedom. For most of the day after the children had gone to school and the Cherians had gone to work, Ms. Barjo was alone in the home. Ex. 2 at ¶3. She could have walked away at any time. Not only could she have left out the front door on those occasions, but she could also have left out her separate door in the basement at any time, day or night. Ex. 1 at ¶6. Moreover, help was readily available in almost any direction, and easily within walking distance. For example, in addition to the elementary school right behind the home located at 6300 Lone Oak Drive there was a church, North Bethesda United Methodist; a bus stop only about a quarter mile away; and a public library also about a quarter mile away. Ex. 1 at ¶14. In addition, within two miles of the house were not one but two different hospitals, the National Institutes of Health Clinical Center, which even provides free interpretation and translation services for those with limited English proficiency (see website, https://www.cc.nih.gov/), and the Johns Hopkins Suburban Hospital. *Id.*

6

And if that were not enough, the National Center for Children and Families (NCCF), which is a "trusted and recognized champion of the community and its most vulnerable members," was just over a mile away. *Id.* at ¶15 (quoting NCCF's website, http://www.nccf-cares.org/our-mission/). There was also within about a half a mile a fire department, as well as a post office about a mile away. *Id.* Finally, the houses on that block were close together, and Ms. Barjo could have simply knocked on a neighbor's door and asked for help at any time. But of course she never did. Ex. 2 at ¶4.

Plaintiff asserts that she wanted to study English, but that the Cherians prevented her from doing so, presumably in order to control her more easily. Compl., ¶61. Nothing could be further from the truth. As a matter of fact, Mrs. Cherian *encouraged* Ms. Barjo to study English. She bought her basic English grammar books and English reading books. Ex. 1, ¶13. She required her children to sit with her one hour each day and teach her English and math as part of their chores. *Id.* at ¶12. Mrs. Cherian also encouraged Ms. Barjo to write letters to her brothers back in India in English, which she did (they would have to find someone to translate the letters in order to read them). *Id.* Mrs. Cherian wanted to see Ms. Barjo get her GED and succeed here in America. *Id.* Ms. Barjo seemed motivated to learn the language. In fact, she sometimes practiced her English while watching television into the wee hours of the night by writing down the dialog she was hearing on the television shows. Mrs. Cherian actually happened to still have some of Ms. Barjo's writings from that time. *See* Attachment A to Decl. Vivian Cherian, copy of some of Ms. Barjo's writings. The writings reflect passable penmanship, good spelling, a growing vocabulary, and some rather colorful language. *Id.*

Ms. Barjo also alleges that she was not paid regularly. Compl., ¶38. In truth, however, Ms. Barjo was always paid everything she was owed, even when she had not worked a full week

for the Cherians. Ex. 1 at ¶¶10, 30, 32; *see also* Ex. 2 at ¶21. Indeed, upon deciding to leave her employment at the Aberdeen House in 2012, Ms. Barjo signed a Release acknowledging that she had been "paid in full." *See* Ex. A to Ex. 2, copy of Release signed by Shanti Barjo and dated February 4, 2012.[3] Moreover, after she left, Kenneth Cherian's brother, Frank, took Ms. Barjo to the bank to open an account, and she deposited $20,000. Declaration of Frank Cherian, Ex. 3, at ¶18. In addition, she told Frank that she also had a locked suitcase with $10,000 in cash in her room. *Id.*

As the Cherian children grew older and needed less help, there was less and less for Ms. Barjo to do at the Cherians' home. Additionally, Mrs. Cherian had concluded that Ms. Barjo was not performing adequately, and had informed her that she would have to return to India. Ex. 1 at ¶20. So when Mr. Cherian opened the Aberdeen House in Rockville, MD in 2002, Ms. Barjo began working there.[4] Compl., ¶¶49-50; *see also* Ex. 1, ¶17. Mrs. Cherian was not involved in the Aberdeen House. Ex. 1, ¶19. And although Mr. Cherian was the sole owner of the company, he was also a professor and spent little time at the Aberdeen House. Ex. 2, ¶7.

**Ms. Barjo was not Mistreated at Aberdeen House.**

1. *Ms. Barjo had ample opportunity to report any wrongdoing.*

Ms. Barjo claims that she was mistreated and overworked at Aberdeen House, and that she was underpaid or not paid at all. Compl., ¶¶51, 55, 61. In fact, as was the case at the Cherians' home in Bethesda, so also Ms. Barjo was free to leave Aberdeen House at any time.

---

[3]  The Release, which is dated February 4, 2012, also states that Ms. Barjo would vacate the house she was living in at Aberdeen House **by February 12**, and that she would remove all her belongings **by the end of the month**. *Id.* But Ms. Barjo claims in her Complaint that she "fled the Cherians" when she had finally obtained her passport. Compl., ¶63. Remaining in the home -- owned by the Cherians -- for eight days after "fleeing" and then coming back for her belongings more than three weeks after "fleeing" gives the lie to her claim.

[4]  Ms. Barjo claims she was "forced" to go to work at Aberdeen House. Compl., ¶50. Mrs. Cherian explains it differently: having been told she would have to return to India, Shanti was eager to find better paying employment and make some money before returning. Ex. 1 at ¶26, 32.

Ex. 2 at ¶11. Aberdeen House was an open facility -- visitors were free to come and go at all hours, and the staff, too, was free to come and go. Ex. 2, ¶11; Ex. 3, ¶19. In fact, the facility saw a steady stream of social workers, county inspectors, first responders, law enforcement officers, doctors and nurses, friends and family members, and occasional members of the clergy pass through its doors, almost always unannounced. Ex. 2, ¶11. Ms. Barjo could not have asked for a better opportunity to speak with any one of a number of officials, mandatory reporters, and law enforcement personnel had she believed she was being mistreated. Not once in all her years at Aberdeen House did she say a word.

Additionally, the Cherians did not oversee the scheduling of the employees or the assignments of work. Instead, they left that entirely up to the staff itself. Ex. 2, ¶9. As a result, Aberdeen House has experienced remarkably low turnover, and job satisfaction is quite high. *Id.* Moreover, neither Kenneth Cherian, when he oversaw Aberdeen House, nor Frank Cherian, when he managed the facility, spent much time on the premises. Ex. 2, ¶7; Ex. 3, ¶6. Ms. Barjo therefore had complete freedom to report any maltreatment either to staff or to authorities.

The house where Ms. Barjo lived while working for Aberdeen House was located at 14304 Bauer Drive in Rockville, MD. Ex. 2, ¶8. There is a Methodist church located at the end of the street, perhaps a quarter mile away. Behind the church is a field through which one may easily cut through to a public library. There is a bus stop less than half a mile away. Two blocks away, off of Frankfurt Drive there is a public school. There is a fire department a little over half a mile (1/2) away as well as a shopping center around the same distance. There is a post office less than a mile away. There is a police station two and a half (2.5) miles away, and a homeless shelter three and a half (3.5) miles away. *Id.* Again, Ms. Barjo could easily have walked to any

one of these facilities, or a host of others, to make a report of any wrongdoing. She did not do so. She could also have walked to the bus stop and left altogether.

Moreover, on several occasions a friend of Ms. Barjo's would park a car within walking distance of the facility, and Shanti would leave to spend a half hour or more with him or her during the afternoons. Ex. 3, ¶19. Frank Cherian and Aberdeen House had no problems with this behavior, so long as the work was being done and the patients cared for. *Id.* Once again, then, Ms. Barjo is shown to have had opportunity to report wrongdoing or to "flee" Aberdeen House, but chose to remain instead.

2.     <em>Ms. Barjo's passport was at her disposal.</em>

Ms. Barjo contends that the Cherians seized her passport and kept it from her as a means of controlling her. Compl., ¶¶3, 46. In fact, Mrs. Cherian on two separate occasions went with Ms. Barjo to the Indian embassy to try to have the passport extended. Ex. 1, ¶25. They were unsuccessful, however. *Id.* Mrs. Cherian had no intention of keeping Ms. Barjo's passport away from her. She had simply placed it with the other passports and kept them all in one bag for ease of retrieval and safekeeping. *Id.* After the passage of some years, the package was misplaced, but when Ms. Barjo asked for it again in about 2011, Mrs. Cherian searched diligently for it and finally located it. She promptly returned it to Ms. Barjo. *Id.*

Contrary to her claims in the Complaint, Ms. Barjo did not "flee" immediately upon receiving her passport. Instead, in late 2011 she went to Mrs. Cherian and demanded additional pay for her time working for the Cherians. Ex. 1, ¶39. Mrs. Cherian told Kenneth about it, and left it to him to deal with. *Id.* Mr. Cherian consulted a lawyer, discussed the matter with his brother, Frank, and they then offered to increase Ms. Barjo's salary at Aberdeen House. Ex. 2, ¶20. In addition, they offered her a lump sum for any alleged back pay she thought she was

owed. *Id.* Ms. Barjo told Mr. Cherian that *upon the advice of counsel* she was declining the offer. *Id.*

Nothing more was heard about the matter. Then, in February, 2012, Ms. Barjo informed Frank that she was leaving for another job. Ex. 3, ¶21. Frank and Ms. Barjo had always enjoyed a friendly relationship. *Id.*, ¶23. He then discussed with her when she planned to leave, how she wanted to handle her possessions, and ensured that she had received all she was owed. Once they had agreed on the timing and terms, Frank prepared a Release reflecting their agreement. Ms. Barjo looked it over and then signed it without any further comment. *Id.*, ¶22.

## ARGUMENT

### I. The Complaint Should be Dismissed with respect to Claims Arising Prior to December 19, 2003.

#### A. Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the Complaint. The Court assumes that the well-pled facts are true. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (internal citations omitted). A plaintiff may not, however, rely on mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The Court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Factual allegations must be sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235-236 (3d ed. 2004)).

Given the high costs of discovery and litigation generally, "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in

11

terrorem increment of the settlement value." *Twombly*, 550 U.S. at 557-58 (internal quotation marks and citations omitted). In short, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A plaintiff "must plead sufficient facts to allow a court to infer 'more than the mere possibility of misconduct.'" *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 274 (4th Cir. 2010) (quoting *Iqbal,* 129 S. Ct. at 1950).

While the court should of course "construe facts in the light most favorable to the plaintiff, and draw all reasonable inferences in [her] favor. . . . [it] 'need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agenc*y, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). In addition, in considering a Rule 12(b)(6) motion, the Court "is not confined to the four corners of the complaint." *Oberg*, 745 F.3d at 136. The Court may also "take judicial notice of matters of public record," "documents incorporated into the complaint by reference," as well as "those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) and *Philips v. Pitt Cnty. Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir.2009)) (internal quotation marks omitted).

**B.**     **Plaintiff's Claims as to Actions Occurring Before December 19, 2003 are not Actionable.**

1.     *Section 1595 does not apply retroactively because it would impose new burdens and consequences on defendants.*

As a threshold matter, each of Plaintiff's six asserted causes of action is brought under 18 U.S.C. §1595, which confers on alleged victims of violations of the forced labor and human trafficking laws the right to bring a civil action against the alleged perpetrator. *See* Compl. But that section did not become law until December 19, 2003 -- well over six (6) years after Ms. Barjo came to the U.S. to live with the Cherians. *See* Pub. L. 108–193, §4(a)(4)(A), Dec. 19, 2003, 117 Stat. 2878; *see also Mouloki v. Epee*, 262 F.Supp.3d 684, 695 (N.D. Ill. 2017) (noting that "the Trafficking Victims Protection Reauthorization Act of 2003 went into effect on December 19, 2003").

That section does not confer a right to bring a civil action for anything that occurred prior to December 19, 2003. It operates only prospectively, not retroactively. "Section 1595 does not apply retroactively to conduct that occurred before December 19, 2003." *Mouloki*, 262 F.Supp.3d at 695 (citing *Ditullio v. Boehm*, 662 F.3d 1091, 1099 (9th Cir. 2011) (citing *Landgraf v. USI Film Prods*., 511 U.S. 244, 249–50, 265, 269–70, 281–83, (1994) and *Yamaguchi v. United States Dep't of the Air Force*, 109 F.3d 1475, 1480, 1482 (9th Cir. 1997) (holding that Section 1595 does not apply retroactively because it added new legal consequences to TVPA violations and because it creates new liabilities rather than new rights)); *Doe v. Siddig*, 810 F.Supp.2d 127, 136 (D.D.C. 2011) (applying Section 1595 retroactively would be "impermissible" but plaintiffs could pursue claims for conduct occurring after that date until her escape in 2009); *see also Labojewski v. Gonzales*, 407 F.3d 814, 819 (7th Cir. 2005) (internal

13

citations omitted) (when unclear whether a statute is meant to be retroactive, "prospectivity remains the appropriate default rule.")).

In *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011), the defendant had pled guilty to conspiracy to engage in human trafficking, admitting that he had provided illegal narcotics to minors in order to recruit them into sexual activity and prostitution. *Id.* at 1093. The time period during which he engaged in this criminal behavior was between 2001 and December 22, 2003. The plaintiff was one of the defendant's victims, who brought suit under the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589 et seq., pursuant to §1595. The district court first denied the plaintiff's motion for summary judgment and the defendant's motion to dismiss, and then certified two questions of first impression to the Ninth Circuit Court of Appeals:

> (1) whether the TVPA permits recovery of punitive damages, and (2) whether the TVPA's civil action provision, 18 U.S.C. § 1595 (which became effective on December 19, 2003), applies retroactively to conduct occurring before its effective date, particularly when the perpetrator may have engaged in sex trafficking after the statute's effective date.

*Id.* at 1093-94. Even under the egregious facts presented in *Ditullio*, after carefully analyzing the issue the Ninth Circuit squarely held as to the second question that "18 U.S.C. § 1595 cannot be applied retroactively to conduct that occurred before its effective date." *Id.* at 1094.

The court of appeals carefully reviewed the congressional history of the Act as well as Supreme Court pronouncements on rules governing retroactivity. *Id.* at 1099-1102. It observed that the "'time honored presumption [is that] unless Congress has clearly manifested its intent to the contrary,' 'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place.'" *Id.* at 1099 (quoting *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 946 (1997) (quoting *Landgraf v. USI Film Prods*., 511 U.S. 244, 265 (1994)). The Ninth Circuit also observed that Congress had not expressly prescribed the statute's reach, and

concluded that "that § 1595 of the TVPA cannot be applied retroactively to conduct before December 19, 2003 because to do so would impose new burdens and consequences on [the defendant] for preenactment conduct." *Id.*

> 2.      *The majority of Plaintiff's claims arose before December 19, 2003; therefore they are not actionable and should be dismissed.*

Applying the law precluding civil claims arising before December 19, 2003 to the case at bar requires that the bulk of Plaintiff's claims be dismissed because they are not actionable. In effect, Plaintiff's Complaint generally follows a chronological order. Consequently, all of her factual allegations before paragraph 57 should be disregarded because they address matters that occurred prior to December 19, 2003. *See Mouloki*, 262 F.Supp.3d at 695 ("Because of this, Mouloki cannot hold the Epees liable under the TVPRA for conduct that occurred prior to December 19, 2003."); *Ditullio*, 662 F.3d 1091, 1102 ("§ 1595 does not apply to pre-December 19, 2003 conduct").

Plaintiff's factual assertions begin back in 1994, in India, then progress methodically through Ms. Barjo's arrival in American in 1997, then detail alleged atrocities occurring at the Cherians' home between 1997 and 2002 or 2003. *See generally* Compl., ¶¶11-56. For example, in section II. of the Complaint, Plaintiff claims that she was "lured" away from India to come to America **in 1997**, where she was "held captive." *See* Compl. at 4-5, esp. heading II. (**"Vivian Lures Shanti to the United States For Forced Labor."**); *see also id.* at ¶¶17-26, and esp. ¶19. Again, Plaintiff alleges that the Cherians subjected her to forced labor in their home in the U.S., and that they "exploited and abused" Ms. Barjo there. *Id.* at 5-8, esp. heading III; *see also id.* at ¶¶38-42, and esp. ¶28 (detailing time between 1997 and mid-2002 or 2003).

The next section of the Complaint, section IV., begins to focus on Ms. Barjo's work at Aberdeen House, which opened in 2002, but several paragraphs again focus on events occurring

before December 19, 2003. For instance, paragraph 49 specifically mentions the date of "mid-2002." *Id.* at ¶49. Likewise, paragraphs 50-56 appear to deal largely with events prior to 2004. *See, e.g., id.* at ¶50 ("Shortly after the opening" of Aberdeen House, . . .); *see also id.* at ¶52 (referring to Kenneth Cherian as a supervisor; Mr. Cherian relinquished supervisory duties to his brother, Frank, in 2005); *id.* at ¶55 (referring to Kenneth Cherian paying the employees); *id.* at ¶56 (specifically referring to 2003).

The law of the matter is clear: "18 U.S.C. § 1595 cannot be applied retroactively to conduct that occurred before its effective date." *Ditullio*, 662 F.3d at 1094. Because the bulk of Plaintiff's allegations target conduct occurring before the effective date of section 1595, they must be dismissed.

**C.      Plaintiff has Waived her Claims arising out of her work at Aberdeen House by virtue of the Signed Release.**

Plaintiff began work at Aberdeen House shortly after it opened in 2002. Compl., ¶49. She worked there until she "fled" in 2012. *Id.* at ¶63. When she left Aberdeen House, Ms. Barjo signed a Release stating unequivocally that she had been paid in full for her services and that she holds "Aberdeen House and its management free and clear of all legal and financial obligations." *See* Ex. A to Defendants' Exhibit 2, copy of Release. The Release reads in its entirety:

February 4, 2012

<u>To Whom It May Concern:</u>

I Shanti Barjo residing at 14304 Bauer Drive, Rockville, Maryland 20853 has voluntarily decided to vacate the house by Sunday (February 12, 2012). I promise to remove all my belongings by the end of this month. Personal items not removed by me after this deadline may be disposed off as needed.
 I have also been paid in full for all my sub-contracted services and hold Aberdeen House and its management free and clear of all legal and financial obligations.
Sincerely,

*Shanti Barjo*

Shanti Barjo

Releases, like settlement agreements, "are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts." *Maslow v. Vanguri*, 896 A.2d 408, 419 (Md. Ct. Spec. App. 2006). "If a contract is unambiguous, the court must give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Nova Research, Inc. v. Penske Truck Leasing Co., L.P.*, 952 A.2d 275, 282 (Md. 2008). The "court must presume that the parties meant what they expressed." *United Servs. Auto. Ass'n v. Riley*, 899 A.2d 819, 834 (Md. 2006) (internal quotation marks omitted). "[T]he very nature of a general release is that the parties desire to settle all matters forever. A general release ... not only settles enumerated specific differences, but claims 'of every kind or character, known and unknown.'" *Zandford v. Prudential-Bache Securities, Inc.*, 112 F.3d 723, 727 (4th Cir. 1997) (quoting *Virginia Impression Prods. Co., Inc. v. SCM Corp.*, 448 F.2d 262, 265 (4th Cir. 1971)).

Here, Ms. Barjo signed the release agreeing to "hold Aberdeen House and its management free and clear of all legal and financial obligations." Ex. A to Ex. 1. There is

nothing vague or ambiguous about it; she is releasing both Aberdeen House and its management from any and all claims, whether legal or financial. There are no time limitations on the claims from which she is releasing Aberdeen House and its management, and there are no exceptions. Ms. Barjo holds Aberdeen House and its management "free and clear of **all** legal **and** financial obligations." *Id.* (emphasis added). Similarly, there are no particular managers or principals excepted from the release -- all are covered. Additionally, it is noteworthy that unlike the employment contract agreed to back in 1997, which Ms. Barjo signed with a fingerprint, the Release is clearly signed in what purports to be Ms. Barjo's own hand, which bears a strong resemblance to the manuscript handwriting seen in Ms. Barjo's handwritten notes submitted by Mrs. Cherian as Attachment A to her Declaration.

In exchange for her release, Ms. Barjo was granted a grace period within which to vacate the house as well as time to remove her belongings. The transaction appears objectively to have been made at arm's length; there is no hint of impropriety or coercion. This inference is even more powerful when considering that Ms. Barjo had quite recently retained a lawyer to assist her in her attempts to obtain additional monies from Defendants in late 2011. *See infra* pp. 9-10 (describing how Ms. Barjo approached Mrs. Cherian and demanded additional money for her time working for the Cherians, and how Mr. Cherian consulted a lawyer to determine how to respond; Ms. Barjo turned down his offer on advice of counsel). Ms. Barjo had already shown herself savvy enough to have hired an attorney and willing and able to walk away from an offer that would put money in her pocket on the spot.

Ms. Barjo's willingness to refuse the good faith offer of Mr. Cherian in late November is understandable in light of Frank Cherian's experience with her after she left Aberdeen House. They maintained good relations, and Frank drove Ms. Barjo to the bank and to CASA in order to

help her obtain a valid ID and open a bank account. Ms. Barjo deposited **almost $20,000** in her account. *See* Ex. 3, ¶18. In addition, she told Frank that she had **another $10,000** in her suitcase back at the house. *Id.* This was no destitute immigrant who had not been receiving her pay. This was an astute financial manager who had saved and built a nest egg that she carefully administered and oversaw for a long period of time. No one was going to take advantage of Ms. Shanti Barjo when it came to money. Had she had any concern about the terms in the Release, she could have easily called her lawyer to discuss the matter before signing off on it (and maybe did call her lawyer; we don't know).

In short, Plaintiff's claims against Aberdeen House and the Cherians have been voluntarily and finally waived insofar as they arise from Ms. Barjo's time at Aberdeen House. The Complaint should therefore be dismissed to that extent.

## CONCLUSION

Plaintiff's claims may be neatly divided into two categories, claims arising from her work for the Cherians individually, in their home, and claims arising from her work at Aberdeen House. The claims arising from Ms. Barjo's work in the Cherians' home arose prior to December 19, 2003, the effective date of 18 U.S.C. §1595. They are therefore not actionable. The claims arising from Ms. Barjo's work at Aberdeen House have been waived, and are likewise no longer valid. Consequently, Plaintiff's Complaint should be dismissed in its entirety.

Respectfully submitted,

  /s/_____
John R. Garza Bar Number 01921
Garza Law Firm, P. A.
Garza Building
17 W. Jefferson Street, Suite 100
Rockville, Md 20850
Phone: 301 340 8200, Extension 100
E-mail: jgarza@garzanet.com

19

*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY certify that the foregoing Memorandum in Support of Motion to Dismiss was sent to all counsel of record via the ECF electronic filing system on this August 1, 2018.


_/s/_____
John Garza