# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **SHOSHANTI BARJO,** | * |
| *Plaintiff*, | * |
| v. | * Case No. RWT 18-cv-1587 |
| **VIVIAN R. CHERIAN,** *et al.*, | * |
| *Defendants*. | * |

## MEMORANDUM OPINION

On June 1, 2018, Plaintiff, Shoshanti Barjo ("Barjo"), filed this action against Defendants, Vivian Cherian and Kenneth Cherian ("Mr. and Mrs. Cherian" or "the Cherians"), and Aberdeen House, Inc. ECF No. 1. Defendants filed a Motion to Dismiss the Complaint in its entirety on August 1, 2018, and Barjo filed an Opposition on August 29, 2018. ECF Nos. 7, 17. For the reasons stated below, Defendants' Motion to Dismiss will be denied.

## I.  Factual Background[1]

Barjo, born and raised in rural poverty in India, began part-time work as a domestic worker in India for the Cherians in 1994 at the age of 18. Compl. ¶¶ 11, 14. Up to this point, Barjo had received almost no education and had limited English language skills. *Id.* ¶¶ 13, 21. In 1995, Barjo moved into the Cherians' home to begin working full-time, sharing work with the Cherians' other domestic workers. *Id.* ¶ 16. Two years later, Mrs. Cherian was offered a job in Washington, D.C. *Id.* ¶ 17. After the Cherians promised to pay Barjo $210 per week for an average of forty hours of work per week, and no more than 60 hours per week under any circumstance, Barjo agreed to move with the Cherians to Washington, D.C. *Id.* ¶¶ 17-20. Barjo

---

[1] Unless otherwise indicated, these background facts are based on the allegations in the Complaint.

signed an employment contract. *Id.* ¶ 20. However, it was written in English so she relied on Mrs. Cherian's representation of the terms when signing it with her fingerprint. *Id.* ¶¶ 20-21. Mrs. Cherian then arranged for Barjo to get an Indian passport and a G-5 Visa from the U.S. Department of State, and Barjo moved to the United States with the Cherians in 1997. *Id.* ¶¶ 22-24.

From her arrival in the United States until 2002, Barjo worked in the Cherians' home where she was treated much differently than she was as a domestic worker for them in India. *Id.* ¶¶ 28, 50. Barjo was forced to work between 100 and 110 hours per week. *Id.* ¶ 29. She was not given a bed or blanket, was forced to sleep on the floor, then later on a sofa, and was denied heating for where she slept. *Id.* ¶ 34. Barjo was not allowed access to a coat to walk the kids to school, subsequently getting sick because of that; her food and drink intake were closely monitored, limited, and ridiculed; and when she requested improved living conditions, she was told, "You used to sleep on the floor in India, why do you need anything more?" *Id.* ¶¶ 35-36. Mrs. Cherian screamed at Barjo daily, making her feel like a slave and reducing her to tears for transgressions such as waking up thirty minutes late. *Id.* ¶ 33.

The Cherians did not pay Barjo for her work, lying to her about a bank account opened in her name where her pay would be deposited. *Id.* ¶ 38. When Barjo asked for her money so she could buy winter clothes, Mrs. Cherian refused and became enraged, instilling fear in Barjo that prevented her from asking for pay again. *Id.* ¶¶ 39-41. Occasionally, Barjo's family in India received payments from the Cherians, but these payments did not equal what Barjo was due in wages under the terms of the contract. *Id.* ¶ 42.

Barjo was told to be "good" because the Cherians brought her to the United States and secured her immigration documentation, and she was threatened with possible deportation if she

were "bad." *Id.* ¶ 31. Upon arriving in the United States, the Cherians retained possession of Barjo's passport for many years. *Id.* ¶ 5. Barjo first believed this to be custom, but when she later asked for the passport the Cherians refused to give it to her and instead kept it in a locked briefcase, which Barjo perceived as a tactic to prevent her from leaving. *Id.* ¶¶ 25, 46-48, 56. The Cherians then let Barjo's visa lapse, thereby subjecting her to possible deportation. *Id.* ¶ 47. The Cherians reminded Barjo that she could be deported, which then made her afraid to ask for her passport or salary and subjected her to feeling trapped at the Cherians with no other recourse. *Id.* ¶¶ 47-48.

The Cherians kept Barjo isolated from others, including from her own family in India with whom she was only allowed to speak rarely and always with Mrs. Cherian listening in on the conversation. *Id.* ¶¶ 43-45. When she was allowed to interact with others, it was always with those who were related or indebted to the Cherians, so Barjo could never seek help from anyone to help her with her documents. *Id.* ¶ 45. Then, in 2002, Mr. Cherian opened a retirement home, Aberdeen House, and Barjo was moved from the Cherian's home to Aberdeen House, where she worked until 2004. *Id.* ¶¶ 49-50.

The work at Aberdeen House required similar hours and was physically demanding. *Id.* ¶¶ 50-51. Barjo had to shovel snow, mow lawns, and pick up and move residents. *Id.* ¶ 51. The humiliation and degradation continued, this time at the hands of Mr. Cherian's mother who supervised Barjo at the facility. *Id.* ¶ 52-54. Barjo continued to demand pay and Mr. Cherian continued to refuse. *Id.* ¶ 55. After two years of physically demanding work, Barjo developed severe leg pain—of which she still suffers today—so the Cherians moved her back to their home where she resumed domestic work until 2006. *Id.* ¶¶ 57-59. In 2007, after deeming her well enough to work, the Cherians forced Barjo to return to work at the Aberdeen House. *Id.* ¶ 60.

Eventually Barjo managed to secure her passport from the Cherians and left the control of Aberdeen House and the Cherians on February 12, 2012. *Id.* ¶ 63.

## II. Procedural Background

Barjo filed a Complaint [ECF No. 1] against the Cherians and Aberdeen House on June 1, 2018, alleging six violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595: 1) forced labor violation of the TVPA, against the Cherians; 2) trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of the TVPA, against the Cherians; 3) forced labor violation of the TVPA, against Aberdeen House; 4) trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of the TVPA, against Aberdeen House; 5) unlawful conduct with respect to documents in violation of the TVPA, against the Cherians; and 6) conspiracy to violate the TVPA, against the Cherians and Aberdeen House. Defendants then filed a Motion to Dismiss the Complaint in its entirety on August 1, 2018. ECF No. 7. Defendants attached three affidavits and two exhibits to their Motion, basing their arguments largely on their view of the facts as presented with their Motion. ECF Nos. 7-1, 7-2, 7-3, 7-4, 18-1. Barjo filed her Opposition on August 29, 2018. ECF No. 17.

## III. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) serves "to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In order to be sufficient to survive dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a motion to dismiss, courts must consider all "well-pleaded allegations of the complaint as true," *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and "must construe factual allegations in the light most favorable to the plaintiff." *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir. 1999). However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). To survive a motion to dismiss, a complaint must put forth "plausible claim[s] for relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

"As a general proposition, 'summary judgment is appropriate only after 'adequate time for discovery.''" *Greater Balt. Ctr. for Pregnancy Concerns, Inc., et al. v. Mayor & City Council of Balt., et al.*, 721 F.3d 264, 280 (4th Cir. 2013) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). Generally, "when documents which were not appended to the Complaint are submitted to the court in connection with a Motion to Dismiss . . . those documents either are not considered or the motion is converted to a summary judgment motion with proper notice to the parties." *Biospherics, Inc. v. Forbes, Inc.*, 989 F. Supp. 748, 749 (D. Md. 1997). If the court elects to convert the 12(b)(6) motion to one for summary judgment, then "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). That is to say that "[s]uch

5

conversion is not appropriate where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (citing *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985)) (holding district court erred in converting Rule 12(b)(6) motion to summary judgment when it was clear that nonmoving party had not received all of moving party's contracts upon which the moving party, and ultimately the court, relied). A reasonable opportunity for discovery must go beyond the mere beginning of discovery. *See id.* (overturning an award of summary judgment where plaintiff had filed four affidavits in opposition to the motion because discovery "had barely begun," plaintiff's "initial interrogatories were only partially answered," and defendant claimed that much of the requested material was privileged).

## IV. Analysis

It is a fundamental principle that a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) serves "to test the sufficiency of a *complaint*," (emphasis added), not the sufficiency of those allegations as challenged by evidence presented outside of the complaint. Here, the Defendants choose to ignore this fundamental principle. They fail to accept Barjo's allegations as true, present extraneous factual allegations, and do not even point to the facts in the Complaint in arguing that she failed to state a claim. To the extent that the Defendants' Motion to Dismiss is based on "alternative facts" presented by their affidavits, it will be denied.

Defendants' other arguments in favor of dismissal can be broken down to two points: first, Defendants argue that because each of Barjo's claims arose prior to the effective date of the statute providing the cause of action, the Complaint must be dismissed in its entirety; second, Defendants argue that any claims against the Aberdeen House must be dismissed because they contend that Barjo signed a release. ECF No. 8 at 13, 16.

Turning to the first argument, Section 1595 of the TVPA, which created the private right of action for violations of Sections 1589 and 1590, took effect on December 19, 2003. Although no court in this jurisdiction has decided whether Section 1595 applies retroactively, numerous courts in other jurisdictions have found it lacks retroactive effect. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012); *Ditullio v. Boehm*, 662 F.3d 1091, 1100 (9th Cir. 2011) ("[S]ection 1595 cannot apply retroactively to conduct that occurred before its effective date."); *Mouloki v. Epee*, 262 F. Supp. 3d 684, 695 (N.D. Ill. 2017) (same); *Doe v. Siddig*, 810 F. Supp. 2d 127, 136 (D.D.C 2011) ("[C]onclud[ing[ that permitting private litigants to bring suit under Section 1595 for violations of Sections 1589 and 1590 based on conduct predating December 19, 2003 would have an impermissible retroactive effect, one that this Court declines to endorse absent an affirmative contrary expression of intent from Congress."). *Cf. Elat v. Ngoubene*, 993 F. Supp. 2d 497, 522-23 (D. Md. 2014) (finding that the 2008 TVPA amendment does not apply retroactively while citing to the discussion of other courts regarding the 2003 amendment's lack of retroactive application).

This Court is persuaded by that position. In our legal system there is a strong presumption against retroactivity because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Unless a statute clearly and expressly provides for retroactive effect, the presumption applies. *See Landgraf*, 511 U.S. at 280. Congress created an entirely new private right of action when Section 1595 took effect on December 19, 2003, allowing private litigants to seek relief for violations of Sections 1589 or 1590. To allow a plaintiff to seek a remedy for such a violation that took place entirely before the statute's effective date would undoubtedly "increase a party's liability for past

7

conduct." *Landgraf*, 511 U.S. at 280. And thus, because Congress did not clearly provide for retroactive effect of the newly created private right, this Court finds that Section 1595 does not apply retroactively and Barjo may only seek relief for conduct after the statute's effective date.

Where Defendants go wrong is in calling for the dismissal of the Complaint in its entirety because the facts leading to violations of Section 1595 began prior to the statute's effective date. Although no plaintiff can make a claim under Section 1595 where the facts take place *entirely* before the effective date, plaintiffs certainly can make claims where a series of continuous events comprising a Section 1595 claim began prior to and continued past the statute's effective date. *See Guobadia v. Irowa*, 103 F. Supp. 3d 325, 335 (E.D.N.Y. 2015) (holding that plaintiff could recover for TVPA violations occurring after December 19, 2003); *Siddig*, 810 F. Supp. 2d at 136 (same).[2]

As for Defendants' second argument, there are limited exceptions as to what evidence outside the Complaint a court may consider at this stage, including public records and documents that are authentic and integral to the complaint. *See Phillips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Here, the Complaint never references the Release and it is thus neither essential to nor incorporated into the Complaint. Because neither of the exceptions applies here, the Court cannot consider the Release in ruling on the Motion to Dismiss. Therefore, the Court will reject Defendants' argument for dismissal because it is an argument without any meaningful reference to the allegations set forth in the Complaint.

Finally, even if this Court were to consider Defendants' affidavits and thus convert the Motion to one for summary judgment, Rule 56(d) stands squarely in its way. The Rules are clear: before entering the summary judgment stage, parties must have adequate time for

---

[2] Notably, *Guobadia* also holds that pre-enactment facts may be considered as "background and context for alleged post-amendment conduct," because the evidence is addressed from a totality of circumstances standard. *Guobadia*, 103 F. Supp. 3d at 335-36.

discovery to gather facts for their cases. Here, Defendants included with their 12(b)(6) Motion three affidavits and two exhibits presenting their own version of events, but discovery has yet to even begin. Barjo has not had the opportunity to depose Defendants; to evaluate the veracity of Defendants' affidavits via discovery; or to investigate the Release presented by Defendants. This Court cannot evaluate Defendants' facts and evidence without first allowing Barjo to properly prepare and present its full case after discovery. For these reasons, the Court declines to convert Defendants' Motion to Dismiss to one for summary judgment.

## V.     Conclusion

For the foregoing reasons, Defendants' Motion will, by separate order, be denied, but the Plaintiff will be precluded at trial from recovering damages or other relief for any conduct predating December 19, 2003.


Date:  October 22, 2018                                       /s/
                                                     ROGER W. TITUS
                                                     UNITED STATES DISTRICT JUDGE